Good morning. May it please the court, Christian Schreiber on behalf of plaintiff Andrew Roley, I'd like to reserve four minutes of my time for rebuttal. I'll try to help you. This case presents the panel with the District Court's clear error as to California contract law in an order that is in direct conflict with this court's precedent. The parties include a huge high-tech company involved in the contract for high-tech information with tech-savvy class members. But the contract principles at issue are decidedly low-tech, and Google's conduct involves an age-old tactic that predates any of this technology, which is the bait-and-switch. In its simplest terms, Google promised one thing and delivered another, breaching a unilateral contract that it made with its local guides, an army of Google users who agreed to give Google valuable content for the Google Maps product in exchange for a valuable reward for their efforts, which was a terabyte of data storage. Now, Google still retains the benefit of the labor of these thousands of class members, and it has done so after withdrawing the benefit it used to class members. Counsel, let me ask you this. I'm not sure I'm a typical user, but I confess I don't think I have ever read in its entirety one of these contracts that comes along with software, hardware, or whatever, because they go on for days, basically. I've almost thought of them as contracts of adhesion. And yet here, you have a very sophisticated offeror, and you have what you've described as some fairly sophisticated potential acceptees of the unilateral offer, because they're people who are going to provide a service that is going to be integrated into Google's map program. So as we analyze this, and we have some cases, as you know, the Reynolds case, for example, that basically talk about this sea of words, if you will, doctrine. But here, does any of that play? No, we have sophisticated parties on both sides, and we have to look at it in that fashion rather than sophisticated, common, ordinary folks who have no idea what the contract says. Well, I think it's very important to distinguish where the sophistication lies. So the class members here are not legally sophisticated in the sense that they've got legal training. I dare say that the very vast majority of them are no more prepared to work through an end-user license agreement than Your Honor, as you've described here. So, I don't believe the sophistication level of the class members extends beyond the fact that they have some facility with the technology. What matters here, and just to be clear, this is a contract of adhesion in the sense that Google made an offer that wasn't negotiable, but that offer was made, and it's comprised of several documents. And that, I think, is actually the core of the district court's confusion here. But ultimately, what we're left with is this gross inequity, which is that all these class members provided Google exactly what Google asked for. Google got the benefit of the bargain, and then after these class members performed, Google changed the terms in a material way after the class members had handed over the valuable content. Well, of course, as you very well know, what we're dealing with here, Google would say, okay, it's just like a treasure hunt. If you press the right hyperlinks, you will eventually get to what we intended, which was a two-year limitation. Your survey says, and your class pleadings say, what are you talking about? We never say anything about that. It's just the advertisement is 1T of storage space forever. That's what we understood, and you have a survey to the same effect. How do we work our way through based on our case law in a unilateral contract setting to deal with this case? It seems like there's been an acceptance, but what do they accept? Are they required to press every hyperlink in order to know what was offered, or is it just what the ordinary person would glean from what they see on the paperwork? Well, I think it would be a very dangerous precedent for this court to establish that a consumer accepting a unilateral contract offer was under an obligation to click through 16 different irrelevant pages to find some buried material term, play stairway to heaven backwards and figure out if there is, in fact, some material term that is going to bind them. Here, the offer was fairly clear from the outset, and Google provided the remainder of the information necessary, but it's really important here, and to respond more directly to your question, there are sort of two cases that I think are most on point, the Satteralli case and the Donovan case from the California Supreme Court, which offers a peek into sort of how California, how the California court system would handle a contract offer. Mr. Schreiber, I think the one thing that wasn't clear, this seems to be the whole controversy between your client and Google, is that the term of the offer, the term of the offer, was not clear at all, was it? Oh, I think it was perfectly clear. How was it clear? Well, the absence of a durational term does not require a durational term to be imputed, and certainly not a two-year term. So you're saying it doesn't have to be clear, then? You're not saying it's clear, you're saying it doesn't have to be clear. It doesn't even have to be stated. Well, I actually... Is that your case? Sorry, Your Honor. Is that your case? I believe that the term was clear. The class members in this case believed that the reward that Google was giving them was theirs to keep. And I think maybe it's instructive if you'd indulge a hypothetical. If I were to respond, if a bank were to advertise free checking, and I were to read the advertisement, go into the bank, and say, hey, I'm signing up for a free checking account. And the bank signs me up, and then two months later, that bank says, hey, by the way, your checking account is now $15 a month. Now, there was no durational term on the advertisement. Why would I presume that it's two years in this particular instance, or in the example of the checking account, two months? I think the question before the district court... Maintains in perpetuity. I don't think that was an unreasonable presumption that Google, this massive company with billions of dollars at its disposal, would be handing out, in exchange for valuable content, by the way, that it maintains in perpetuity. And I guess the easiest way to respond to your question, Your Honor, is to say that the absence of a durational term didn't impute a durational term for Google's use of the class member's user-generated content. When was this two-year benefit first published? The two-year benefit was disclosed to the consumers... At the first time that they disclosed the other terms? After they... No. No, Your Honor. Judge Seiler, the two-year term was disclosed at the time the consumer went to redeem the benefit that they were awarded. That is after performance. So in other words, you sign up, you hand over your content to Google, and then Google says, congratulations, you've hit the mark, here's your terabyte, click on this link to redeem our class members, including Mr. Rowley, clicked on the link, and as they were doing so, it said, by the way, this is just for two years, after that you've got to give us $10 a month, in order to maintain it. And that's the inequity, is the change in a material term after Google had already induced performance. I think we all are struggling with at least one aspect of this. If this were a bilateral contract, you'd have a problem, because you wouldn't have a meeting of the minds. But I think everyone agrees it's a unilateral contract. You put forward an example like the checking account. Probably fairly accurate, except it's much simpler in a checking account situation. But can you have, under California law, basically an executory unilateral contract in a situation like this, where they say, this was always there, you just had to click through to see it. Your clients say, well, we didn't see that until we went to claim our reward. Nobody else did either. They said there are different circumstances where people might have seen it elsewhere. Does that affect the formation of the contract, or is it merely there are subparts, and people would be treated slightly differently, depending on what and when they knew it? Well, I'd like to say two things about that, if I may. The first is that, to be clear, the noise around other disclosures is not relevant. This class received no communications that there was a two-year term, until after they had performed. So it's an essential fact here. They gave Google the 200 points worth of content, they approved the MAPS product, and then Google said it's a two-year term. Now, as to your question about whether there was a meeting of the minds, there was clearly a meeting of the minds. And this, I think the one quibble I would have with the question that you asked, Your Honor, is you said everyone believes that there was a unilateral contract, and I think that's actually what's in dispute. The district court didn't concede that, and Google went back on what it had argued all through the litigation, that there was an agreement, that there were terms, and that now the terms were indefinite. And to that point, that's simply not the case. Google was literally tracking every single entry that class members put up. You could go onto the dashboard, and there was a running chart, or a running tally of how many points you had on your way to 200 points. So this is not a situation where there wasn't a meeting of the minds. I mean, if you'll indulge another hypothetical here. For example, let's say that Google had taken the position that instead of a terabyte, we're going to give you 50% as much, 500 gigs. And so you do the 200 points, and Google says, here's 500. Or perhaps we could suggest something different, which is you get to 199 points, and then Google says, every entry from now on is worth just 1,000th of a point. So you never get to 200. I mean, in those scenarios, I think we would agree that Google went back on its word. But here, it's no different. And if you accept that Google breached in that scenario, then you have to accept that Google's introduction of a two-year term after performance had been approved. From your perspective, your class members, however they found out, accepted the offer, provided the information, and they only found out once they tried to redeem that it was two years. If somebody found out differently, they may be a sub-part of the class, but if something got pulled back, that might be a breach of good faith or something like that. But the contract was formed, from your perspective, clearly with the understanding by your class members that this was for an indefinite amount of time on the terabyte of storage, right? That's right. And what's more is that these class members, they all received the solicitation email. All of them. They also all registered. I'm sorry, they all received what? I didn't hear you. Excuse me. The solicitation email, the photo impact email. They all registered, they all assented to the program terms, and those program terms, in turn, provided them with information about how to get to 200 points. So everyone received a common set of contract documents. And so there is no... Mr. Schreiber, stepping back a little bit then, speaking of what everybody understood in the common set of documents now, an important part of the set of documents, in your case, is the benefits page, right? Do you read that? It provides information that was relevant to the documents. It's essential, isn't it? Well, I mean, we think it provides relevant information, and yes, we would say it is part of the contract because it establishes the level of... All right. I think you know where I'm going. Google's position is that you took a position before the district court during the summary judgment motion argument that no, the benefits page was not included as part of the contract. Well... I mean, that's Google's position, right? And further that, you're bound by that admission. Now, you know, I don't get a clear answer in your brief to that contention. What is your response to that? My response to that is that Google has misrepresented what was discussed at the hearing, and I don't believe that that claim withstands scrutiny. If one were to read the transcript, the entire transcript that I had with Judge Freeman, multiple times Judge Freeman recognized, and this is true in our briefing as well, that we considered the benefits page to be an essential contract document, and I said as much at the hearing. So it is true that Google takes the position that that particular quote is somehow an admission that I can't go back on. However, there are several points in the same transcript where I make very clear and express that our position is that the benefits page is a contract document, and I guess I would respond further by saying that, you know, that makes sense, and the district court appeared to be confused by this, and I'm going to wrap up to reserve time, but I do want to just bring this to the court's attention, which is in the Satirale case, the court, this court, said that the court applies a reasonable person under the circumstances test, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer, and this, in the particular case of Satirale, included the catalogs and the C-notes and the surrounding circumstances of these cigarette buyers, and in the same way, this was a group of Google asked them to do further. The district court's obligation was to provide an opportunity for us to try this case to the jury about whether Mr. Rowley's position was reasonable, and his interpretation of the contract was reasonable. He's an MIT student and an active duty naval officer. He's not, you know, taking unreasonable positions in terms of interpreting how that offer was made by Google, but I'll go ahead and save the balance of your time. Yes, please. Very well. All right. All right, counsel. Forgive me, how do I say your name? Somvichian? Somvichian, Your Honor. Okay, very good. I apologize if I ever mispronounce people's names. You got it right. Okay, thank you. Thank you, Your Honor. Good morning. It's great to be back in person in court. This is my first time since the pandemic. May it please the court, I'd like to respond to a number of counsel's contentions, but if there are specific things you'd like me to address first, I can do that as well. At some point during your presentation, I would appreciate your addressing the Satirale case, because at least to me, what that says is, what would a reasonable person think when they see this offer? Now, I'm shorthanding it. Yes. And as your opposing counsel has pointed out, I guess Mr. Rowley's a pretty smart guy, MIT and Naval Reserve or whatever reserve it was. The reality is, we may be dealing with a different kind of reasonable person, but I'd be interested in your thoughts about how much the kind of contract that is here plays into what is reasonable. You heard what I said before. I mean, I've never obviously taken a survey, but I would wager that only a tiny fraction of the people who use software or hardware ever read the contracts. They don't know how to, or even if they do, they're so extensive and for most people so boring they wouldn't bother to read them. So I think the Satirale case says something about that, and I think it may apply here, and I'd like your response about that at some point during your presentation. It does, Your Honor, and that's actually where I'd like to start. Very well. We've been talking about the contract, the terms, the offer, unilateral contract, and I think as a starting point, we really need to be clear about the different sources of the contractual obligations that the plaintiffs are trying to enforce. There is a contract. It's a written contract. It's not a unilateral contract. It's the program terms and conditions. They're also called the program rules. Can you just stop for one second? Yes. Law school-wise, a unilateral contract is where you have something put out by the offeror, and the way it's completed is by someone else fulfilling what the original offer is, as opposed to two parties each going back and forth. In a unilateral contract, you've got terms. People accept it by doing something. That's what happened here, isn't it? One aspect of that is part of the plaintiff's allegations, Your Honor, but we have something of a hybrid situation here. So the first thing that a local guide does, so... This is a bi-uni? I don't know what we'll eventually call it, Your Honor, but there is a unilateral contract that's alleged to have been formed via this photo impact email. We'll come back to that. But the starting point for the case, the starting point for how somebody becomes a local guide is acceptance to the program terms and conditions. So... Where the benefits page, is that part of the original contract? It's linked from the program terms and conditions, Your Honor. Was it linked from the start? The benefits page has always been linked in the program terms and conditions. And just to work through the flow here so there's no confusion, supplemental excerpts of record at 48 is the screen that every local guide sees and must click first a box to say they accept the program rules, and then a separate button to submit, and now they are a local guide. In going through that process, in clicking that check box and then clicking submit, they have agreed to the local guide's program terms and conditions. That's at supplemental excerpts of record 50. And may I ask, at that point, how many hyperlinks would the potential, if you will, contractor have to click through in order to fully understand the terms of the offer? It depends which path they take, Your Honor, but if you're talking about the two-year limit to the one terabyte of drive storage benefit, that was essentially two clicks away. Two clicks. And those would have been what? What would they have to click to get there? Yes. So if you take a look at supplemental excerpts of record 50, that's the program terms and conditions. And Your Honor, you mentioned a sea of words and potential confusion. This is a three-page document. The most significant terms of which are that Google determines the benefits in its discretion. On the first page, local guides may be eligible for various benefits and rewards as part of the program depending on their level and location. It goes on, quote, benefits are offered at the discretion of Google and its affiliates. Let me ask you this. Unless you've got an illusory contract from the get-go, that actually only applies once the contract's been formed, right? In other words, Google has a right to change the terms after the contract is formed. You're not saying that whatever we have here doesn't really mean anything because we can change it before you decide to accept? It's not an illusory contract, Your Honor. Okay. And the district court found that the discretion that Google has is bound by the implied duty of good faith and fair dealing. Right. But what I'm trying to understand here is that only applies after the contract has been formed, right? And the formation of the contract comprised of the program terms and conditions is that click-through process by which a person becomes a local guide. Okay. These obligations are present obligations. We're not communicating. It may be my fault. But what I want to be sure and understand here is if the person clicks through, they may know what you're saying they know. But the ability of Google to change the terms only applies, I gather, once the contract has been formed. The person has clicked through and signed, right? Yes. Okay. That's what I understand. You couldn't change the terms before the person knows they're changed and in the process of trying to agree to this arrangement. No. The obligations in the program terms only bind someone after they've gone through that click-through process. Right. So what all you're saying then is after the contract has been formed, Google can change the terms. Of course, they're subject to the covenant of good faith and fair dealing and so on. But it's only after the contract has been formed, right? Yes. Okay. And once it's been formed, what local guides agree to, I mean, again, they don't have to do anything. They can simply join and decide, I actually don't want to participate further or contribute points. But if they do, they have committed to do so pursuant to these terms and subject to the discretion of Google to provide benefits in its choosing and in its discretion. To your question... Counselor, I don't think you mentioned yet the... I didn't hear it. The help center pages. Now, what's the relation of those pages to the contract itself? Yes. So to address your question and also Judge Smith's question, the help center is linked from the program terms and conditions. It's linked at two places. It's linked on the first page of the contract in the text that says in our help center that's underlined. And it's also linked a second time at the very end, at the text help at the end. I'm looking at supplemental excerpts of record 52. So the contract provides a direct way for local guides to get more information about the benefits that are being offered at that time in Google's discretion. And to your point about how difficult is that to get, you click help center. That goes to the front page of the help center. From there, it's another click to get to the specific pages that at this point in time describe the free drive benefit storage. And those pages at all times disclosed the two-year term that applies. So you and your friend on the other side totally disagree about that. You're saying from the get-go, if they did two clicks, they would know there was a two-year limitation on the terabyte offer. He says the only way they knew was once they had complied with the terms of the program, then they would be told when they went to get the benefits that there was a two-year limitation. That's wrong from your perspective, right? No. There's no factual dispute here, Your Honor. Okay. If you can ask him on a reply, there's no dispute that these help center pages were available. Now, you didn't have to click through them to find them. Right. And some may have and some may not have. That's a separate issue from what counsel is referring to. He's referring to a separate direct disclosure that was sent to every class member. So what happens was if you have gone through this process, you've clicked, you've agreed to these terms, you've continued to perform, you've earned 200 points, you've reached level four. At that point, Google sends you a notification, congratulations, you've earned level four. What you got was a free terabyte of drive storage for two years. Okay, but before they do that... It didn't say two years, did it? It did. Okay, but before... Did that communication? Yes, it did. What page of the excerpt is that on? Excuse me, Your Honor, if I could get the other excerpt. It was called the redemption email, and it was sent at the point when somebody actually earned the benefit. And that's what we're talking about. That's what I really want to... To me, I thought you were talking about two different things, but you are saying, are you not, that before the redemption letter was sent, congratulations, that someone who wanted to participate in the program with a couple of clicks would have known from the get-go that there was a two-year limitation on the terabyte of storage offer. Is that correct? Correct, Your Honor. And what points in the record would you refer me to, to walk that through? Yes. I'm the new person. I want to decide whether I want to participate in that program. I'm at your site. You're going to tell me what I click to see the two-year limitation. Are you talking about the... From the get-go. I'm not talking about the redemption. I'm saying at the very beginning, because what I understood before from what you said and what your opposing counsel said was, you said from the beginning they knew. He says, no, you didn't know anything until you got that congratulatory letter. You reached the 400 points. I'm wanting you to clarify how in the beginning the participant knows that it's a two-year limitation. Yes, so those help center pages. Okay, so help center, that's immediately knowable when you look at the contract, right? There are two links to the help center. Do you have to hit two to get there, or are there... In other words, what's the original document that the person sees? Yes. In terms of record 50. Okay, ER 50. And what am I looking at at ER 50? I'm sorry, supplemental in terms of record 50. Oh, SER, okay. SER 50, that's the local guides program terms and conditions. On the first page there is a reference to in our help center. That's underlined text. That's a link to the local guides help center. Okay, and just a regular person hearing the terms help center, would they not think, well, I've got a problem. I'll go to the help center, but I don't think I have a problem. Would they feel that they had to click the help center in order to know the full terms of the contract? I can't speak to the understandings of a particular individual. We know from the plaintiff that he had a question in his mind about how many points do I need to earn to get this terabyte of drive storage, and what are the specific provisions of it, and he went to the help center. So he viewed that source as the source to go to to learn more about benefits. Okay, and that's at SER what, the help center? Yes, there's four versions of them, your honor. SER 77, 79, 81, and 83. Okay, so I click through, I go to the help center, and you've got four different versions. Would I know from looking at all of those that there was a two-year limitation on the terabyte? Yes. Each one said that. Yes, I'm looking at 77. If you become a local guide level 4+, you can receive one terabyte of free Google Drive storage for two years. Got it. Now, isn't it the plaintiff's position, though, that the help center pages are not a part of the contract? It is. But it's also, again, I want to be clear about what the theory is. They're the program terms that we're talking about. You're not answering my question. Isn't it the plaintiff's position that the help center pages are not a part of the contract? I'm sorry, your honor. Yes, it is the plaintiff's position. All right, now, is it your contention that the plaintiff is in error in that belief? No. The help center is a part of, it's linked from the program terms. Our view is there is no contractual obligation to provide any particular benefit. The help center advises consumers what the current benefits are that Google is providing in its discretion. But we wouldn't view that as a contractual obligation. We have to provide a terabyte of drive storage at all. It could be any other benefit that Google determines in its discretion. And what the plaintiffs are trying to do here, to your point about Saturali and the contract, we're not talking in this case, the theory is not about a breach of the program terms and conditions. Everybody agrees that all local guides are bound by them and that Google has discretion to determine what the benefits are. It could have said it's not a drive, a terabyte of drive storage. It's less or it's not drive storage at all or whatever it might be in its discretion. And at what point could it have said that? Well, the plaintiff's theory, your honor, is that Google's discretion was overridden because of a marketing statement in the photo impact email, and now we're talking about the alleged unilateral contract offer and the standards in Saturali. Well, I guess this kind of gets back to what we talked about before. Here I'm looking at whatever, and I see this local guides program. And whatever I see there and whatever I click to, unless I see something to the contrary from Google, is Google not bound by those terms? I know they can change after the contract is entered into based on what we've talked about. But up to that point, unless they're notified of a change, aren't they bound by those terms? There may be a requirement, your honor, to give notice in some instances. That's what the district court found at the motion to dismiss stage. But that would be the only implied limitation on the exercise of Google's discretion, other than what the plaintiffs are alleging, which is that in addition to the program terms and conditions that give Google discretion, there's a separate unilateral contract offer that was made that overrides that discretion and required Google to provide a free terabyte of drive storage, not only for the two years that everybody got, and just to address this point about inequity, everybody in this class got free drive storage for two years, about a $200 benefit. And the question is, was Google obligated to go beyond that and provide the drive storage for an indefinite term? And that turns on this theory around the photo impact email. And to your point, your honor, about Sotorolli, what Sotorolli says is, in order for the plaintiffs to override the discretion and impose this additional contractual obligation, that marketing email has to do two things. It has to promise a particular benefit. And that's what we've been talking about, and was it sufficiently clear? But that's actually not what drives the result in this case, your honor, because the other component that Sotorolli says you have to have in order for there to be a unilateral contract offer is an invitation to do a specific act that's needed to entitle you to that benefit that constitutes acceptance of that offer and entitles you to that point. I guess that's what troubles me. You and I were talking about whether it was a unibuy or whatever, whatever you got here, that whatever was said, when Mr. Raleigh, as a representative, sees it, and he says, I want to participate in this program. He clicks the boxes, he performs. I'm not sure I still understand your position that Google had the right to change the terms of what was presented to him, even though he didn't know about the change. Is that correct? Google was entitled to change the benefits pursuant to the terms, yes. In other words, it makes an offer, and he accepts it. That's my term. He makes an offer. Raleigh accepts it by doing something, and basically Google says, we were kidding. We only meant X. Is that what it is? Well, that's not the factual record. No, I understand that. I'm just saying, arguendo. Could they have done that? The benefits, I'm sorry, the terms allow them to change their benefits, and there's no provision that limits that based on where somebody has started to perform. If that were the case, Your Honor, if so long as anybody has earned— Counselor, in fairness to your point, I think his position is different. He's saying, sure, Google can change the benefits, but you can't change it after the other side has fully performed and earned what they believe was the then-stated benefit, which is a benefit of one terabyte without any durational limitation. Isn't that his case? Your Honor, I think Sotomayor actually speaks to this point about when something can be changed, and I'd say I'm about to run out of time. As long as we're asking you questions, go ahead. Go ahead, Ben. Sotomayor says, Your Honor, that where the contract—let me back up. Sotomayor acknowledges the general premise that a contract cannot be changed once performance begins, but it also acknowledges that that default rule is impacted by the written agreement that exists. So in the facts of that case, there were certain catalogs that said the terms could be changed, the benefits could be canceled at R.J. Reynolds' discretion, and the court said in that case because of that, this rule around that precludes modification of terms after the beginning of performance does not apply. Do you have that in your documents that was distributed? Excuse me, Your Honor? Do you have such a clause like that from Sotomayor? Yes, Your Honor. At S.E.R. 51, that's the provision that says benefits are subject to change. Any other questions by my colleagues? I think we could go on for a long time. We thank you very much for your argument, counsel. So, Mr. Schreiber, you have a few minutes of rebuttal time. Thank you, Your Honor. I want to address some of the issues that were raised specifically. Judge Tsushima, you asked about the transcript and the provision, or excuse me, the quote in Google's papers. Directed in page 28 of the motion for summary judgment hearing transcript, which Judge Freeman acknowledges, and again on page 31, that our argument was that the benefits page did comprise the contract. My friend, it lied. I'm sorry. Give me that page. Page 28, you said? Yes, Your Honor. Page 28 and page 31. And what does it say? Okay, thank you. It's an acknowledgment that Judge Freeman recognized that we were making the argument that the benefits page did form part of the offer that Google was making. That was before the final exchange with the district judge, in which you agreed that, yes, it's not a part of the offer, right? That came at the end. I don't think that's right, Your Honor, but I confess I don't know the page number. Well, let me see. Let me see. Let me find it. ER page 63. No? Now what it says there, right? See, that's sort of right at the end, you know. I think I would take the position, Your Honor, though, that the full context of both the transcript as well as our papers suggests that the benefits page has always been something that we've considered relevant to the offer. See, but you're referring to these other pages, page 28, page 31, and so on, where you stated what your position was. But at the end, the court said, do I understand you're saying that the benefits page doesn't need to be considered as part of the offer? And you say, yes, you know, that's a fair characterization. Part of that, Your Honor, is that Judge Freeman required us to accept that if we included the benefits page, then we necessarily included an incorporation of the help center, which was not an accurate statement of the law. Then I think your answer shouldn't have been that's a fair representation. You should have said, no, that's not my position. Shouldn't you? But you didn't do that. You accepted her statement as a fair representation of your position. Right? You didn't say, no, no, I don't agree with that because, you know, we think one is included and the other is not. Let's assume for a moment that what Judge Tashima read is exactly what the record says. Are you bound by that at this point? And if not, why not? Well, I don't think I'm bound by it because I think the context of all of our briefing, including on this appeal, as well as in the district court and in the colloquy with Judge Freeman in the district court, makes clear that we considered the benefits page to be relevant and part of the offer. So it's kind of a yes, but response, right? I mean, I dare say, and I approach this with some humility, which is that if I made a mistake by conceding where Judge Freeman was leading me, I do think that the weight of my statements, both in the briefing as well as in oral argument, suggests something opposite of that. Okay. We've taken you over your time. I know you have lots and lots that you would like to say. May I just say one thing, Your Honor? Okay. One thing quickly, please. Okay. The one thing I would say is that on ER 230, which is the local guides program terms and condition referenced by my friend, that does not link to the Help Center page disclosing the two-year term. By its express terms, it says, this review is considered high quality when it adheres to the guidelines described in our Help Center. And Mr. Rooley did not visit the Help Center. And my friend elides the timeline. He visited the Help Center only after he had fully performed in July and the redemption had taken place. That was the first and only time, and there's no evidence in the record anywhere that any member of the class ever visited the Help Center disclosure. Okay. Very well. Any other questions by my colleague? We thank both counsel. This is obviously an important case. We thank both of you. It's always nice to have very capable lawyers who know their materials well. Helps the court do its job. The case of Raleigh v. Google is submitted. And the court stands adjourned for the week. Thank you, Your Honor. Thank you, Your Honor. All rise.
judges: Siler, TASHIMA, SMITH